Statement of the Case.
MONBOE, J.
Plaintiff sues on an instrument reading as follows:
“Monroe, La., April 12, 1907.
“Mr. B. B. Blanks,
“Monroe, La.
“Dear Sir: I hereby offer for your acceptance, on or before June 15, 1907, to sell to you, for $4,500, cash, sixty shares of the capital stock of the Merchants’ and Farmers’ Bank, represented by stock certificate No.-, owned by me and standing on the books of the bank in my name.
“Yours truly,
“[Signed] Wm. J. Sutcliffe.”
He alleges that at the date of this offer the bank was in an unhealthy condition, and the stock offered worth less than $4,500; that after securing the offer he sold to one Franklin all the stock owned by him, and agreed to sell him the stock so offered by defendant, and that by reason of such sale and agreement, and the consequent bringing in of new capital, the stock of the bank (the name of which has been changed) has advanced in value and is now worth $150 per share; that, though bound to deliver the stock offered on payment of $4,500 at any time pri- or to June 15, 1907, defendant in bad faith refused to comply with his obligation, and that he, plaintiff, having accepted defendant’s offer within the time allowed, and having tendered the price, became entitled to the stock as the purchaser thereof. He prays for judgment for specific performance, or, in the alternative, for $4,500, as the difference between the agreed price and the present value of the stock.
Defendant for answer says that plaintiff was president of the bank, and, as such, the agent of the stockholders; that he represented to defendant, acting through others, that the stock was not worth more than 75 cents on the dollar, and that he intended to sell his entire holdings (which defendant believed constituted a majority of the whole issue) at that price, and “would like to get an option on the 60 shares owned by respondent, to include in, and assist in making, the contemplated deal, * * * at the same price at which plaintiff was willing to sell, * * * and for the better protection of respondent’s interest therein”; that, believing the representation so made, defendant executed the offer sued on; that he subsequently learned that plaintiff had willfully misrepresented the condition of the bank and the value of the stock, and had obtained said offer by fraud, having, in fact, arranged to sell the stock at a premium of $13 a share, which it was fairly worth; that, on making such discovery, on or about April 22, 1907, and before plaintiff had accepted his offer, he withdrew the same; that the offer or option was given without consideration, was a mere pollicitation, was not accepted prior to withdrawal, and did not constitute a contract, but was a nudum pactum. Mrs. Sallie E. Breard and others intervene, alleging that they sold the stock in question to defendant for $6,000, represented by his note, secured by pledge of the stock, which- noté-is past due and unpaid, and they pray for judgment thereon with recognition of thei* right of pledge. Plaintiff, answering the intervention, alleges that the interveners are *451 really the owners of tlie stock, which, was put in the name of Sutcliffe to screen them from possible liability, and that the arrangement between Sutcliffe and himself was made at their instance and for their benefit.
The facts as we find them are as follows:
The Merchants’ & Farmers’ Bank had not been prospering for several years prior to the month of April, 1907, and at times was thought to be in danger of closing its doors. Plaintiff seems, however, to have been regarded as a man of resources, and about the date of the giving of the offer here sued on had created in some minds the impression that he would be able to carry ,the bank through its troubles. There was nevertheless no demand for the stock, and it would probably have been difficult to have sold it on the market for 75 cents on the dollar. It was about that time, or possibly a short while.-before, that plaintiff began negotiations with a St. Louis Trust Company with a view of having that company take over a majority of the stock and rehabilitate the concern, the negotiations resulting finally in an agreement whereby plaintiff undertook to deliver stock to the amount of $55,000 at about $1.04, and to guarantee certain of the accounts or claims appearing as assets on the books. The stock about which this litigation has arisen had belonged to the Breard family and had been sold to defendant, who gave a note, secured by pledge, as stated in the intervention, in payment of the price. The Breards having a vital interest in the matter, the negotiations with plaintiff were conducted by them; defendant being willing to abide by their action. D. A. Breard, Jr., testifying as to the representations whereby Sutcliffe (with the approval of the Breard family) was induced to make the offer here sued on, says:
“Mr. Blanks represented to me that he was about to sell his interest in the Merchants’ & Farmers’ Bank, which interest I understood to be a controlling interest, to the Bankers’ Trust Company in. St. Louis. Q. What figure?- A. The figure that he afterwards offered to Mr. Sutcliffe for this stock was 75 cents on the dollar. He represented that he was about to sell his stock at this figure, and that he wanted an option on 60 shares owned by Mr. Sut-cliffe in order to put them in this sale, and also in his statements he led me to believe that he was doing me a favor in making the offer, and assured me, as president of the bank, that it was every cent it was worth and every cent he could get for it in the sale, and he went on to say that, after he had sold the stock, the unsold stock would bring nothing like that, and that he did not propose to make any other stockholder an offer of that kind except the Ouachita National Bank, to whom he did make a similar offer, and he also stated that there would be some stockholders who would not get anything for their stock, and that he didn’t care whether they did or not. * * * I knew that, if any one knew anything about the condition of the bank, it was Mr. Blanks, and I knew that any one outside of the employes connected with the affairs of the bank knew nothing about it.”
The statement thus made is not contradicted in any way, and there is no doubt that the offer sued on was made upon the basis of the representations therein testified to. It appears, however, that on April 22d the officers of the trust company having finished their inspection and appraisement of the assets of the bank, the price to be paid to plaintiff for his stock was fixed; and the news, with some exaggeration, having reached defendant and the Breards, they concluded that as their offer proposed the sale of their stock for less than plaintiff was getting for his, and as that was not in accordance with his representations, they would withdraw the offer, and they withdrew it accordingly. Some time afterwards (it is not shown how long) plaintiff and Breard had another conversation, concerning which plaintiff testifies as follows, to wit:
“Mr. Bi-eard came into my office, * * * and he stated to me that he did not want to take 75 cents for this stock, as he had an offer of more than that price for it. I told him the exact situation I was placed in. I agreed to sell $55,000 of the capital stock, * *' * and the parties had accepted it, and that I had some of the stock yet to deliver, and had already gone to some of my friends and secured some of the stock to complete my sale, and that, if he was not satisfied with this 75 cents on the dollar as per the option, if he would join me in the obligation that I had made to the purchasers *453 ■of this stock, he could do so, and every cent realized on this stock that he should have it, provided, if there was any loss in the amount that I had guaranteed payment of, that he should share with me in this, as to the amount of the stock that he had in proportion to the amount that I had sold. I got the list of the accounts and notes which I had guaranteed to the Bankers’ Trust Company for the purchase of the $55,000 of stock and showed them to Mr. Breard, and he simply declined to join me in the proposition.”
There appear to have been several persons ■who contributed their stock to make up the ■number of shares that plaintiff had agreed to' deliver, and they received in the neighborhood of $1.04 per share, though, with one exception, they were not called on to join plaintiff in the guaranty to which he refers. Whether he has been called on to pay anything by reason of his guaranty the record •does not show. We conclude, from his testimony that he at no time agreed or intended to sell his stock to the trust company for 75 cents on the dollar. It may be stated, too, that he did not part with all of his own ■stock, but appeared on the books of the bank as the owner of 30 shares at the date of the trial in the district court. It is conceded that the offer sued on was made wholly without consideration. The learned trisl1 judge reached the conclusion that defend,-ant had the right to withdraw his offer when he did, giving his reasons therefor in an able opinion, and plaintiff has appealed from n judgment rejecting his demand.
Opinion.
Our Revised Civil Code contains the following provisions bearing, more or less, upon the issues to be decided, to wit:
“Art. 1800. The contract consisting o£ a proposition and the consent to it, the agreement is incomplete until the acceptance of the person to whom it is proposed. If he who proposes ■should, before that consent is given, change his intention on the subject, the concurrence of the two wills is wanting and there is no contract, o * * ”
“Art. 1804. The acceptance need not be made by the same act or, in point of time, immediately after the proposition; if made at any time before the person who offers or promises has changed his mind, or may be reasonably presumed to have done so, it is sufficient.”
“Art. 1801. The .party proposing shall be presumed to continue in the intention which his proposal expressed, if, on receiving the unqualified assent of him to whom the proposition is made, he do not signify the change of his intention.
“Art. 1802. He is bound by his proposition, and the signification of his dissent will be of no avail, if the proposition be made in terms which evince a design to give the other party the right of concluding the contract by his assent, and if that assent be given within such time as the situation. of the parties and the nature of the contract shall prove that it was the intention of the proposer to allow.”
“Art. 1893. An obligation without a cause * * * can have no effect.”
“Art. 1896. By the cause * * * is meant the consideration,” etc.
“Art. 1897. The contract is also considered as being without a cause when the consideration for making it was something which, in the contemplation of the parties, was thereafter expected to exist or take place, and which did not take place or exist,” etc.
Taking the articles thus quoted alone into consideration, it might be said as the offer sued on imposed no obligation on plaintiff (to whom it was made), so unless and until plaintiff did something to ripen it into a contract being wholly without consideration, it imposed no obligation on defendant (by whom it was made).
Having been made in terms which evinced a design to give plaintiff the right “of concluding the contract by his assent,” defendant would have been bound by the offer if plaintiff had given his assent within such time as defendant could have been “presumed to continue in the intention” expressed in it, and, in view of the terms of the offer, defendant would have been presumed to continue in that intention until June 15, 1907, if he had not otherwise expressed himself by withdrawing the offer before that date.
Or, to state the proposition in another form, prior to April 22d there was open for plaintiff’s acceptance by his mere assent an offer by defendant to sell his stock. As defendant had received no consideration for the offer, and it, in no way, bound plain *455 tiff, it could not as matters stood bind defendant, who therefore had the right to say to plaintiff, “I am no longer of that intention,” and the matter would have been at an end, since the offer of time was included in and had no more to rest on than the offer to sell.
There is, however, another article of the Code which must be taken into account, and which reads as follows:
“Art. 1809. The obligation of a contract not being complete until acceptance, oi\ in. cases where it is implied by law, until the circumstances which raise such implication are known to the party proposing, he may, therefore, revoke his offer or proposition before such acceptance, but not without allowing such reasonable time as, from the circumstances of the case, he may be supposed to have intended to give the party to communicate his determination.”
The circumstances of this ease bearing upon the question immediately under consideration (as stated by the principal witness for defendant) were, in effect, that plaintiff told defendant that he was about to sell his own stock and wished to obtain the stock owned by defendant in order that he might include it and sell the whole together and at the same price. Considering the offer sued on in the light of this testimony (which came from defendant and was neither objected to nor •contradicted by plaintiff), it appears that it contemplated a sale of defendant’s stock to plaintiff in order that plaintiff'might sell it at the same time and at the same price as his own, and gave him until June 15, 1907, to take defendant’s stock at the price at which it was offered and for the purpose Stated. Defendant being informed, then, that plaintiff’s purpose was to buy his stock in order that he might thereafter sell it with his own, and being, as we assume, aware that the sale of a controlling interest in a bank, supposed to be in an unhealthy condition, is a matter necessarily requiring investigation and delay, he himself fixed the delay that he was willing to allow plaintiff within which the latter was to give his assent to the offer, and in so doing agreed, in advance, that, the time allowed by him was “the reasonable time,” which “from the circumstances of the" case” it was his intention to allow, and hence under the law was obliged to allow.
Conceding (arguendo) that defendant would not have had the right to withdraw his offer within the delay allowed him, if plaintiff, acting in good faith, had carried out the understanding upon which it was based (a question which we do not, here, decide), it does not follow that he did not have that right under the circumstances as disclosed by the record. Plaintiff was not only the president of the bank in which defendant was a stockholder, but for several years prior to the transaction out of which this litigation has arisen had the exclusive management of its affairs. He was therefore perfectly familiar with, whilst defendant was in profound ignorance of, the real condition of the bank, and occupying, as they did, the relation of stockholder and officer in the same corporation, plaintiff was the agent and representative of defendant, and in any matter between them affecting the interest of the latter in the corporation was bound to give defendant the benefit of his superior information. He told Breard (representing defendant) that he was going to sell all of his own stock at 75 cents on the dollar, and that it was worth no 'more, and that, if defendant did not sell to him at that price, he would eventually get less, and it was because of those representations that defendant made-the offer to sell at 75 cents on the dollar. The fact is, however, that plaintiff never did agree with any prospective purchaser to sell his stock at that price, nor does it appear to us that he ever intended to do so, nor as a matter of fact 'did he sell at that price or' sell all of his stock. 1-Ie sold the greater part of his holdings at about $1.04, but retained 30 shares which he still owns. It iS' *457 shown that as part of the transaction he guaranteed certain accounts appearing as assets on the books of the bank, and after-wards (though, how long, does not appear) told Breard that, if he (or defendant) would join in the guaranty, he too would get about $1.04 for his stock. But that was not an acceptance of the offer, as explained by the testimony, and, for aught that we know, came after the expiration of the delay allowed by the offer. And plaintiff does not here ask that defendant be adjudged to deliver his stock at $1.04 a share subject to any obligation of guaranty. This suit is predicated upon the offer as unexplained by the testimony to sell the stock at $75 a share, whereas the real offer was that defendant should sell his stock at the price for which plaintiff should thereafter sell the whole of the stock belonging to him, and as it turns out, plaintiff has not sold the whole of the stock belonging to him, but has only sold part of it, and that part at $1.04 per share, with a condition attached of which defendant was not originally informed, and had had no opportunity to consider when he made the offer. It may be remarked, too, that as the other stockholders (with possibly one exception) who contributed to the number of shares actually sold by plaintiff received about $1.04 per share for their stock, and as plaintiff was acting for all of them, there appears to be no sufficient reason for the attempted discrimination against defendant.
We are therefore of opinion, though for .different reasons than those assigned by our learned brother of the district court, that plaintiffs demand should be rejected and this suit dismissed at his cost.
The judgment appealed from is accordingly affirmed.
NICHOLLS and PROVOSTY, JJ., concur in the decree. LAND, J., concurs in the result.